GEORGE GRAMMEL v. SHERLOCK H. CARMER, RECEIVER.

*Bank drafts—Duties and Liabilities of payee.*

1. The payee of a banker's unaccepted sight draft has no remedy at law against the drawee for refusing to pay it, even if he has funds enough to do so, because between the payee and drawee there is no privity of contract. And if after the draft is given the maker is found to be insolvent, the payee cannot compel the maker's assignee or receiver to pay him more than his pro rata share like other creditors.

2. A draft does not operate as an assignment of the amount named in it in the drawee's hands.

3. The drawee in a draft should pay it on presentation if he has funds ; and he has no concern with the question whether prior drafts are not yet paid.

4. The receiver of an insolvent estate acting in place of an assignee is appointed by an order made on the chancery side of the court, but a proceeding against him by petition to establish a claim in full to the exclusion of the rights of other creditors is in no proper sense an equitable proceeding.

5. Equity has no different rules from those of law in respect to the rights and obligations of parties to negotiable paper.

Appeal from Ingham. (Gridley, J.) June 19.—Nov. 19.

Petition for order on receiver of insolvent estate. The receiver appeals. Order set aside.

*Olds & Robson* for petitioner.

*Chas. F. Hammond* and *Cahill, Ostrander & Baird* for appellant.

COOLEY, C. J. The facts in this case are the following:

On May 15, 1883, Eugene Angell was doing business as a private banker in Lansing, Michigan. His New York correspondent was the Chase National Bank. On the day named Grammel, the petitioner in this case, purchased of Angell two small drafts on the Chase National Bank, amounting together to $174.50, and paid for them. They were ordinary

bankers' drafts, payable at sight. Angell at this time was insolvent, though it was not publicly known, and two days thereafter he made a general assignment of his property for the benefit of all his creditors. Arthur N. Hart was named assignee. Two days subsequent to the assignment the drafts of petitioner were presented to the Chase National Bank for payment, and payment refused upon the ground that the assignee had notified the bank to pay no drafts. The bank had moneys belonging to Angell at the date of the drafts more than sufficient for their payment, and continued to have until the time of presentation. Hart, the assignee, failed to give bond as such, and under the statute the respondent Carmer was appointed receiver to execute the trust in his stead. The Chase National Bank then paid over to the receiver the balance which was due to Angell when he assigned.

On this state of facts the petitioner claimed to be entitled to payment of his drafts in full from the amount paid over to the receiver by the Chase National Bank, and he petitioned the circuit court for an order directing such payment to be made. The receiver contested his right, insisting that he must receive proportionate payment with other creditors; but the circuit court made the order prayed for. The receiver appeals.

It is contended on the part of petitioner that a banker's sight-draft is in legal effect a check, and that if there are in the hands of the drawee funds for its payment, the payee is absolutely entitled to payment from such funds, and cannot be deprived of this right by any action of the drawer, or of the assignee or receiver of the drawer who would stand in his shoes. It is further contended that the holder of the draft may bring suit against the drawee for the amount if the latter refuses to make payment, and that in effect he has a lien upon the fund and may follow it into the receiver's hands if it is paid over to him. And several cases are cited in support of these positions.

The doctrine that a banker's draft, drawn and payable within the country, is in legal effect a check, is held by a

divided court in *Roberts v. Corbin* 26 Ia. 315, in which case it was also held that the holder of a bank check drawn against funds sufficient for its payment may maintain suit for the amount against the bank if payment is refused. The case of *Munn v. Burch* 25 Ill. 35, is relied upon as authority. An examination of the facts in that case will show very clearly that the question supposed to have been decided by it did not arise at all, for the check which was in question had actually been received by the bank on which it was drawn and actually charged up to him on his pass-book. The court went beyond the case and expressed an unnecessary opinion, which in *Chicago &c. Co. v. Stanford* 28 Ill. 168, and *Union Bank v. Oceana Bank* 80 Ill. 212, has been followed as authoritative. See also *Fogarties v. State Bank* 12 Rich. 518; *Lester v. Given* 8 Bush 357. But the great weight of judicial authority is unquestionably to the contrary of this. In *Bank of Republic v. Millard* 10 Wall. 152, 156, Davis, J., speaking for the court says: "It is no longer an open question in this court since the decision in the cases of the *Marine Bank v. Fulton Bank* 2 Wall. 252, and of *Thompson v. Riggs* 5 Wall. 663, that the relation of banker and customer in their pecuniary dealings is that of debtor and creditor." He adds that on principle there can be no foundation for an action on the part of the holder of a check against the bank unless there is privity of contract between him and the bank. " How can there be such a privity when the bank owes no duty and is under no obligation to the holder? The holder takes the check on the credit of the drawer, in the belief that he has funds to meet it; but in no sense can the bank be said to be connected with the transaction." See also *First Nat. Bank v. Whitman* 94 U. S. 343. Many cases might be cited to the same effect if it were needful, but we think the case of *Perley v. County of Muskegon* 32 Mich. 132, recognizes the same principle.

This case, however, is not the case of a check, but of bills of exchange. The bills were drawn by banker upon banker, it is true, and against deposits made to meet them; and it might be difficult to say why any distinction should be taken

between checks and such drafts as to the rules which should govern the rights of the parties. We have no occasion in this case to consider whether a distinction exists, because we think it clear that if it could be held, as some courts do hold, that the payee of a check drawn against actual deposits may sue the banker who refuses to pay it, it would be impossible to so hold in the case of a draft without disregarding long-settled rules.

The cases of *Williams v. Everett* 14 East 582, 597; *Yates v. Bell* 3 B. & Ald. 643; *Hopkinson v. Forster* L. R. 19 Eq. 74; and *Citizens' Bank v. First Nat. Bank* L. R. 6 H. L. 352: s. c. 7 Moak 56, are sufficient to show that the law in England is that the drawee of a bill of exchange is liable on it only after he has become acceptor. The same rule is recognized in *Mandeville v. Welch* 5 Wheat. 277, 283, and *Bank of Republic v. Millard*, already cited. In *Gibson v. Cooke* 20 Pick. 15 it appeared that a party had drawn a bill which was dishonored for want of funds. Afterwards the drawer remitted funds expressly to meet that and another small bill which had previously been drawn. The drawee paid the small bill, but refused to pay the other. It was held that the payee could not maintain an action against the drawee for the amount, there being no privity of contract between them. If any case could be conceived whose facts would support such an action, this must be such a case, for here the funds were remitted for the express purpose of paying the bill sued upon. To the same effect are *Bullard v. Randall* 1 Gray 605; *Hopkins v. Beebe* 26 Penn. St. 85; *Jermyn v. Moffitt* 75 Penn. St. 399; *Gibson v. Finley* 4 Md. Ch. 75; *Poydras v. Delamare* 13 La. 98; *Harris v. Clark* 3 N. Y. 118; *Cowperthwaite v. Sheffield* 3 N. Y. 243; *Winter v. Drury* 5 N. Y. 525; *Noe v. Christie* 51 N. Y. 273; *Duncan v. Berlin* 60 N. Y. 151; *Tyler v. Gould* 48 N. Y. 682; *Risley v. Phenix Bank* 83 N. Y. 318; *Bank of Commerce v. Russell* 2 Dill. 215; *Bank of Commerce v. Bogy* 44 Mo. 13; *Weinstock v. Bellwood* 12 Bush 139; *Caldwell v. Merchants' Bank* U. C. 26 C. P. 294.

The reason for these decisions is found in the fundamental

rules governing this class of paper. The drawer, by drawing and delivering the paper to the payee, agrees that if duly presented it shall be accepted and paid by the drawee, and that in default thereof he will, if duly notified of the dishonor, pay it himself. The drawee enters into no contract relations with the payee in respect to it until it is presented to him, nor then unless he does so by acceptance. If he accepts, he undertakes to pay according to the terms of the bill or of the acceptance; but up to the time of that act the payee looks exclusively to the drawer for his protection. If the drawee refuses to accept when he has funds for the purpose, he becomes liable to the drawer for the wrong done to his credit. *Marzetti v. Williams* 1 B. & Ad. 415; *Rolin v. Steward* 14 C. B. 595. But the payee can maintain no such action for the plain reason that until acceptance the drawee owes to the payee no legal duty whatever. An action at law must be grounded on some failure in the performance of legal duty.

It is said a draft should be considered an assignment of so much money in the drawee's hands. If this were so, then drafts would operate as assignments in the order in which they were given, and should be paid in that order. But to so hold would be to introduce a new and vicious rule into the law of commercial paper. The well-understood rule— and, we may add, the convenient rule—now is that the drawee, when a draft is presented, should pay it if he has funds, and is not concerned with the question whether drafts of prior issue do not remain unpaid. But if a draft operates as an assignment, then either he would pay at his peril, or the payee receiving payment would be liable over to the holder of a prior unpaid draft for money received to his use. This rule would greatly and injuriously affect the value of this class of paper for commercial purposes.

Something has been said in the case about this being an equitable proceeding, as if that should make a difference in the rules that should be applied to it. But in no proper sense is this an equitable proceeding at all. The receiver is appointed by an order made on the chancery side of the

court; but this merely puts him in the place of the assignee who failed to give bond, and in order that creditors may enforce through him their legal rights. When Angell failed, this petitioner had certain legal rights in respect to this paper, and these rights qualified the rights of all other creditors. The failure of Angell and the appointment of this assignee could not increase this petitioner's rights at the expense of other creditors: it leaves them as they were, to be enforced by such remedies as shall be appropriate. The statute which prescribes this particular remedy has no purpose to modify rights in any manner.

But if this were strictly an equitable proceeding it would make no difference. Courts of equity have no different rules in respect to the rights and obligations of parties to negotiable paper to those which are recognized in courts of law, but they recognize and enforce the same rules, and there would be gross injustice in their doing otherwise. Some of the cases above cited in support of these views were cases in equity.

The order of the circuit court is erroneous and should be set aside.

CAMPBELL and CHAMPLIN, JJ. concurred.

SHERWOOD, J. (Dissenting.) This is a proceeding on the equity side of the court to determine the rights of the holder of two drafts upon which payment has been refused by the drawee. The petitioner George Grammel, on the fifteenth of May, 1883, purchased of Eugene Angell, a banker, two drafts amounting to the sum of $174.52, on the Chase National Bank, of New York, which had to his credit a larger amount than the drafts called for. On the seventeenth of May, Angell became insolvent and made a general assignment for the benefit of his creditors to A. N. Hart, of Lansing, who at once took possession of the assets, and on the same day notified the New York bank to honor no drafts thereafter presented, drawn by Angell. These two drafts were presented on the 19th of May, and payment refused, the New

York bank following the instructions of the assignee so to do. Hart failed to file the statutory bond, and the circuit court for Ingham county in chancery, upon bill filed, appointed respondent receiver of the assigned estate of Angell. Other drafts were drawn upon the New York bank by Angell before and after petitioner's, but for what amount, or how many, does not appear. The receiver collected the funds in the New York bank, and refused to pay the amount of the drafts to the petitioner. The prayer of the petition is in substance that the receiver be required to pay the petitioner's two drafts in full out of the funds received by him from the New York bank. The matter was heard before Judge Gridley, who made an order in accordance with the prayer of the petitioner; and the matter is now before us on appeal from that order taken by the receiver.

The petitioner claims that when he received the drafts on the bank in New York he became the equitable assignee of so much of the funds of Angell in that bank as was necessary to satisfy the two drafts.

The receiver claims that the petitioner is not the equitable assignee of any portion of the fund, and cannot have any of it except as a creditor under the assignment for the reasons:

1st. That the petitioner could not bring his action at law against the New York bank without acceptance of the drafts.

2nd. That the drafts did not specify any particular fund upon which they were drawn.

It is true, perhaps, that the petitioner did not take such an assignment of the fund as would enable him to prosecute the drawee at law for the amount of the drafts. His assign- ment, however, was not a legal but an equitable one, and his right of action, therefore, is not at law but in equity against the holder of the fund. Neither is it against the drawee upon the facts appearing in the record, but against the receiver who is in possession of the fund. The equitable action follows the fund so long as its possessor is the assignee or legal representative of the drawer, and can make no claim or defense which the assignor could not, and this is the posi- tion of the receiver. His rights are only those of the drawer

before the general assignment was made. As between him and the payee no other rights have intervened, and he represents no one but the drawer, and now has the fund drawn against in his hands and within reach of the order of this Court. Really, he holds it with no other purpose than to dispose of it as the court may direct.

It is also true that the drafts did not specify any particular fund upon which they were drawn. This was unnecessary as between drawer and payee. It was drawn upon a particular fund as a matter of fact, and that of course was known to both of them without being mentioned in the drafts. The facts were that the payee paid his money with the drawer, and took from him an assignment of so much of the fund he had in the New York bank as the drafts called for; and the drafts were, as between the drawer and payee, no more nor less than a notice to the person in whose hands the fund was of the assignment to the payee, and an order to deliver the amount to him.

The moment the drawer delivered the drafts to the payee, the funds to the amount of the drafts became equitably the payee's, and until his equitable rights ceased to exist they were capable of enforcement in a court of chancery; and the equitable relation the payee sustained to the fund drawn against was not changed by the general assignment creating the trust the receiver was appointed by the court to administer and under which he seeks to defend. The authorities cited by counsel for petitioner, and others, sustain the view which I think should control the question presented in the record.

It is questionable whether Hart had any authority to act in the premises, he not having given the bond required by the statute, but in the view I take of the case and the rights of the holder and other parties mentioned in the drafts, the question is of no consequence. The statute referred to (How. Stat. § 8739), requires that the assignee shall give a bond for the faithful performance of the trust, and file the same with the clerk of the circuit court within ten days after the making of the assignment; and further provides that

"no such assignment shall be effectual to convey the property of the assignor to the assignee until such bond shall be executed and filed with, and approved by, said clerk."

I am aware that there are many decisions which hold a different doctrine from that here expressed; but very many of them are cases at law, not necessarily involving the question presented by this record. It is the equitable rights and equitable remedy of the petitioner which are now before us for review, and to these alone I confine my discussion of the question. I am not able to agree with my brethren, who are for reversal, as to the character of this case any more than I am in the conclusion they have reached. It is said by them "in no proper sense is this an equitable proceeding." Certainly, a general assignment for the benefit of creditors creates a trust, and vests the same in the assignee. The subject of trusts is one of original equitable jurisdiction, and the administration thereof involves largely the subject of equitable remedies, and they can be carried out only under the remedial branch of equitable jurisprudence. Indeed, the jurisdiction is exclusive wherever the distinction between law and equity prevails.

It is not the appointment of the receiver in this case that determines the character of the proceeding and the remedy to be invoked, but the subject-matter and the disposition to be made of it. It is of no consequence how or by whom the receiver was appointed, whether by a court of law or by a court of equity. It is the duty which the appointment devolves upon him that determines the jurisdiction to which he may appeal to aid him in his work, and through which he may be reached if he fails to do right and redress is sought by an injured party.

In this case, it is the respondent who is a trustee. The petitioner claims that through the action of the drawee the receiver has come into possession of a trust fund, a portion of which belongs to the petitioner, and no one else. What does this claim involve? The fact that the receiver is a trustee of the fund petitioner seeks to reach, and in which he has an interest, and to which no other person has any claim. The

petition is a proceeding entirely proper for that purpose, and if there is any other proceeding in any tribunal in this State, except it be an equitable one, to determine the question raised upon the petition, it has not yet been mentioned or come to my knowledge.

Now, what was the true relation of the drawer and holder of the draft when the latter received it? Was it that of debtor and creditor? I think not. Did the holder when he called upon Angell at his bank seek to make Angell his debtor? I doubt if Grammel entertained such a thought for a moment. He had money to *exchange, not to loan;* he only wished to exchange his money with Angell. Angell had money in New York, and Grammel stood before him with his, and he exchanged his for the money in New York, and as has already been said, the drafts were no more than the written evidence of the transaction, and a notice to the custodian of the fund in New York that so much of it as had been exchanged belonged to Grammel, and to let him have it when he called for it. Grammel could not recall his money, and Angell could do no more than he had done to place Grammel in possession of the New York funds. Was not the latter equitably entitled to the moneys he had bought and paid for? Were they not his? As between these parties, must it not be said there was an equitable assignment? Equity and good conscience, it seems to me, require an affirmative answer to these questions.

Now, what was the drawee's position in this case? What were the relations he sustained to these parties? The drawee was the Chase National Bank of New York, a bank of issue, exchange and deposit. This is not the case of an ordinary bill of exchange or draft drawn upon an ordinary debtor who would be bound to accept it only in case the whole indebtedness was called for, and who had the right to choose who should be his creditor. When the New York bank received Angell's money it simply became the custodian of his funds, and when it received them it was upon an express or implied contract that it would deliver the same to such persons at such times and in such sums as Angell might order.

Upon the receipt of the money the bank became a depository for Angell. It was more than his debtor; it became his trustee. Its only business was to keep the fund safely and deliver it to parties when ordered. It could use no discretion in the premises, and while the general depositor has been very properly held to be the creditor of the receiver of the deposit, strictly speaking it could only be so considered, in the case we are discussing, when the depository refused to accept or pay the drafts of Angell; until then the drawee had no claim upon the drawer. *Murray v. Judah* 6 Cow. 490.

At the time Angell made his assignment the drafts had not been presented. Angell had not and never did countermand them. They were on the way to the drawee when the assignment was made. Angell's general assignee forbade payment and it was refused.

The question now arises, what could the general assignee lawfully do? If an equitable assignment and transfer to Grammel had been made, it was his duty to recognize it. He was a trustee, and as such was bound by the rules of equity as well as the rules of law, and in equity he had no control of the fund in the depositary's hands to the amount of the drafts after they had been presented. And the depositary, after the drafts were presented, could only equitably withhold payment a sufficient length of time to ascertain whether or not the drafts were drawn and delivered to the holder before the assignment was made. 3 Kent's Comm. (12th ed.) 88. He however was discharged at law when he delivered over the fund to the lawful general assignee or receiver, but the latter could not take the fund from the depositary discharged of the equitable liability to the holder.

Such I understand to be the true relations of the parties to the drafts and to this suit to the fund now in the hands of the receiver, obtained by him from the Chase National Bank to the amount of the drafts. These views do not impair any just rights of creditors of Angell. By the exchange of moneys Angell had not lessened his bankrupt estate. In no correct view that can be taken of the case does such a result follow, for the estate had received Grammel's money.

In the examination I have given to this question I must confess I have failed to discover in any process of reasoning I have yet read or heard how it is that this general common-law assignment in this case is made to turn this exchange of moneys, executed as far as it was in the power of the parties to do it, into an executory contract never made by the parties, and the effect of which was never contemplated by them, and which is to compel Grammel to allow his money to remain in the hands of the receiver to be distributed among strangers, who never had any claim thereto in fact, and leave him to seek his remedy against a bankrupt and his estate.

Justice to Angell's creditors, as I have shown, requires no such construction. They only ask for what was legally and equitably Angell's when the assignment was made. And as I have also shown, no one can claim that the money given by Grammel to Angell and the fund in New York were both his. Reverse the decision of the circuit judge in this case, and we place in the hands of the receiver $174 of the holder's money, for which he never received the consideration of a farthing, against his earnest protest and without any agreement between him and any other person so to do. If Angell, when he was solvent, had thus treated Grammel, would it not have been a fraud upon his just rights? And is it less a fraud when done by the receiver? I think not.

I trust I have not failed to recognize the great learning and ability of the distinguished jurists who have examined and considered the question presented in this case, and especially those with whom it is my privilege to be associated upon the bench, and with whom I have failed to concur, and I hope I have not failed to comprehend the reasons they have given for the conclusions they have reached wherein we differ. Still my conviction of the great injustice of the rule adhered to by them is so strong that I feel it my duty to withhold my assent.

The question whether or not the payee in a draft or check can maintain suit against the drawee at law after notice or presentation before acceptance, it is unnecessary to decide. That question is now not properly before us in the view I

take of this case. Some courts, however, have gone to the
extent of so holding. *Fogarties v. State Bank* 12 Rich. 518;
*Roberts v. Corbin* 26 Iowa 315; *Chicago M. & F. Ins. Co.
v. Stanford* 28 Ill. 168; *Ambler v. State Bank* 12 Rich. 518;
*Vanbibber v. Louisiana Bank* 14 La. Ann. 481.

The question presented in this case, under the facts stated
is, did the holder of these drafts obtain an equitable assign-
ment to the amount of the drafts of Angell's funds in the
Chase National Bank? The following are authorities, show-
ing or maintaining elementary principles tending to show
that he did : Chitty on Bills (12th Am. ed.) 583, note 2;
Story on Bills, § 13; Story on Eq. Jur. 1040; Byles on Bills,
18–21; Story on Prom. Notes § 489 and notes; Morse on
Banking, 35–37; Daniel's Neg. Inst. §§ 19, 22, 23, 1637–43;
Clarke on Bills, Notes and Checks, 214; Snell's Equity, 96; 4
Kent's Comm. (4th ed.) 549, note; 2 Pars. Cont. 60 and note;
*Row v. Dawson* 1 Ves. Sr. 332; *Gibson v. Finley* 4 Md. Ch.
75; *Lawson v. Lawson* 1 P. Wms. 441; *Field v. Mayor of
N. Y.* 6 N. Y. 179; *Weinstock v. Bellwood* 12 Bush 139; *Gore
Bank v. Royal Canadian Bank* 13 Grant Ch. (Canada)
425; *Mandeville v. Welch* 5 Wheat. 286; *Corser v. Craig* 1
Wash. C. C. 424; *Keene v. Beard* 8 C. B. 379 (Byles, J.);
*Wheatley v. Strobe* 12 Cal. 92; *In the matter of Brown* 2
Story 502; *Walker v. Seigel* 12 N. B. R. 394; *Lester v. Given*
8 Bush 357; *Chicago M. & F. Ins. Co. v. Stanford* 28
Ill. 168; *Fourth Nat. Bank v. City Nat. Bank* 68 Ill. 398;
*Union Nat. Bank v. Oceana County Bank* 80 Ill. 212; *Fogar-
ties v. State Bank* 12 Rich. 518; *First Nat. Bank v. Coates*
8 Fed. Rep. 540; *German Savings Institution v. Adae* id.
106; *Roberts v. Corbin* 26 Iowa 315; *Munn v. Burch* 25 Ill.
35; *Jermyn v. Moffitt* 75 Penn. St. 399; *Robbins v. Bacon*
3 Me. 346; 23 Amer. Law Reg., note on pages 189, 190;
*Vanbibber v. Louisiana Bank* 14 La. Ann. 481, 482;
*National Bank v. Eliot Bank* 5 Amer. Law Reg. 711, 717;
*Kingman v. Perkins* 105 Mass. 111; *Buckner v. Sayre* 18
B. Mon. 745; *Macomber v. Doane* 2 Allen 541.

When a drawee accepts a draft, under the circumstances
of this case, he only gives to the holder or payee written evi-

dence of his duty existing before, and the unquestioned right
of the holder to enforce it at law, which, without it, the
holder could only do in equity.   Many of the cases which
discuss the subject are cases at law, brought by the holder,
and are not therefore, as already stated, in point.   Among
them are the following:   *Bank of Republic v. Millard* 10
Wall. 156 ; *Williams v. Everett* 14 East 582, 597 ; *Yates v.
Bell* 3 Barn & Ald. 643 ; *Gibson v. Cooke* 20 Pick. 15 ;
*Bullard v. Randall* 1 Gray 605 ; *First Nat. Bank v. Whitman*
94 U. S. 343 ; *Noe v. Christie* 51 N. Y. 273 ; *Duncan v. Berlin*
60 N. Y. 151 ; *Tyler v. Gould* 48 N. Y. 682 ; *Marine Bank
v. Fulton Bank* 2 Wall. 252 ; *Thompson v. Riggs* 5 Wall.
663 ; *Harris v. Clark* 3 N. Y. 118 ; *Cowperthwaite v. Shef-
field* 3 N. Y. 243 ; *Hopkins v. Beebe* 26 Penn. St. 85 ; *Poy-
dras v. Delamare* 13 La. 100 ; *Risley v. Phenix Bank* 83 N.
Y. 318 ; *Caldwell v. Merchants' Bank* 26 U. C. (C. P.) 294.
It should be borne in mind that it is only the rights of the
parties to these drafts that are involved in this case.   The
receiver can claim none that the drawer could not, had no
general assignment been made.   *Wakeman v. Barrows* 41
Mich. 363.

No fraud or laches is claimed in this case ; neither have the
rights of third parties intervened, so that the negotiability
of the drafts is of no particular consequence in the considera-
tion of the question presented.

It is said, to adopt the rule I contend for in this case would
be " to introduce a new and vicious rule into the law of com-
mercial paper," because if such drafts as are under discussion
operate as an equitable assignment of so much money in the
payee's hands, then they would do so in the order given.
Suppose we admit such to be the fact (which, I think, would
not necessarily result), could any inconvenience arise except
in case of an overdraft ?   And in such case the same conse-
quences would follow under either rule.   Notice of the draft,
or presentment thereof, in the order drawn would remove
entirely the mischief suggested.   The mails and the tele-
graph furnish adequate means for that purpose.   The effect

of laches by the holder would be followed by the same consequences under either rule.

It is also difficult to see how.the drawee would be placed in any greater peril in the one case than in the other. He would at all times know the amount of the funds of the drawer in his hands and the amount subject to draft. With this knowledge he could not be placed in peril only by his own recklessness or negligence, and against these he is entitled to no protection from the law.

It is also said the liability and hazard of the payee.would be increased ,by the possibility of becoming liable to the holder of a prior unpaid draft. This could never occur except in the case of an overdraft, and so long as the funds in the hands of the drawee are not overdrawn, it would be of no consequence in what order the drafts were presented. Neither rule contemplates or provides for overdrafts. Overdrafts, unless agreed upon or explained, are without authority and a fraud. *True v. Thomas* 16 Me. 36; *Merchants' Bank v. State Bank* 10 Wall. 647; Grant on Banking 89, 90; *Boehm v. Sterling* 7 Term 430.

It is certainly no good objection that the rule contended for is new, unless it fails to secure and protect the rights of the parties better than the old ; but, as I have read the authorities herein cited, the rule suggested is not new; it has received the attention of courts as long as this class of paper has been used in commercial transactions, and in several of our most enterprising states has received the sanction of their courts.

I do not understand in this State the precise question raised in this case has ever been properly before this Court for adjudication. I have therefore felt greater freedom in expressing my views upon the subject. I do not find anything controlling in *Perley v. County of Muskegon* 32 Mich. 133. In that case Perley was an ordinary depositor. He had no special fund in the bank belonging to the county. He had mixed the county funds with his own in making his deposits, and all was passed to his private account. The money was all subject to his draft for miscellaneous purposes, in his

private business, and in several instances his account was over-drawn. There was no express or implied agreement when the money was left in the bank that it was for the purpose of being drawn against for exchange, and in such amounts and in favor of such persons as the owner chose to designate in his drafts. I do not think anything can be properly claimed for the case upon the point we have been considering.

It is also said by the Chief Justice that the reason for the decision adverse to the view I have taken of this case " is found in the fundamental rules governing this class of paper." Any rule is fundamental in equity which secures in its application the just and equitable rights of the parties, and the time of its adoption is of little significance. The rule may exist long before its application by the courts. If the rule is essential to the application of a principle it becomes a part of elementary law, and it existed as early as the reason for its application. In this sense it may be more fundamental than one though of longer standing, but which fails in secur-ing and enforcing the equitable rights desired,—and whenever the rule fails in accomplishing this object the reason upon which it is based must be unsound.

It is further claimed that the " drawee owes no legal duty to the payee until acceptance." Then his relation to the holder becomes that of debtor, and a legal duty to the holder is created. This view is supported by many of the authori-ties. *Bullard v. Randall* 1 Gray 605 ; *Chapman v. White* 6 N. Y. 412, and cases cited. Certainly, if the drawee owed no legal duty to the payee, the payee had no claim against him to be enforced either in law or equity; but was such the fact after the draft had been presented and payment refused ? My mind refuses its assent to this proposition. The drawee certainly had money in his hands belonging to the payee. The owner had transferred his interest in it to the payee, and directed the drawee to deliver it to the holder, and the drawee had promised the drawer he would do so when ordered. How can it be said it was not the drawee's duty to hand the money to the holder, or that duty was not to the holder? A written acceptance would only furnish the legal evidence of that

duty and the drawee's willingness to perform it, and give the holder a remedy at law against him. Such I regard as the legal effect of the written acceptance, and nothing more. In equity and good conscience the money belonged to the holder when the draft was presented, and it was the duty which the drawee owed to him to pay it. See 11 Cent. Law J. 161, as bearing upon this duty. See also *Hall v. Marston* 17 Mass. 575; *Lawrence v. Fox* 20 N. Y. 268; *Beardslee v. Horton* 3 Mich. 560; *Spencer v. Towles* 18 Mich. 9; *Berly v. Taylor* 5 Hill 577.

After a review of the authorities, and as careful consideration as I have been able to give to the subject, I must say I fail to discover how the rule I favor "would injuriously affect the value of this class of paper for commercial purposes," and no one would regret more than myself any ruling the tendency of which would be to produce such a result.

Some of the cases make a distinction between a check and a draft such as we have been considering. *Harris v. Clark* 3 N. Y. 120. But I quite agree with the Chief Justice that upon the facts stated upon this record it would be difficult indeed to show why such distinction should be made. The fact that our statutes prevent preferences in assignments has nothing to do with the case, if the payee is to be regarded as the equitable owner of the fund to the extent of the draft, because in that event he would not be a creditor of the drawer so long as there was enough in the fund drawn upon to satisfy the drafts.

I think the equities are clearly with the petitioner, and the order made by the circuit judge was right, and should be affirmed with costs.